UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ASSOCIATED PRESS,

                                   Plaintiff,

    - against -

UNITED STATES DEPARTMENT OF
JUSTICE, and its component, OFFICE OF
THE PARDON ATTORNEY,

                                 Defendants.

---

ECF CASE

06 Civ. 1758 (LAP)

**DECLARATION**
**OF TED BRIDIS**

I, TED BRIDIS, pursuant to 28 U.S.C. § 1746, do hereby declare:

1. I am a staff writer for The Associated Press ("AP"), plaintiff in this lawsuit under the Freedom of Information Act ("FOIA"). I submit this declaration in opposition to the summary judgment motion of the Department of Justice ("DOJ") and the Office of the Pardon Attorney ("OPA," and collectively, "defendants").

2. The Associated Press is a not-for-profit, news sharing co-operative that gathers and disseminates the news to newspapers, magazines, broadcasters, cable television networks and Internet content providers throughout the United States and around the world.

3. At issue in this lawsuit is an AP request to inspect an application for clemency submitted to the Office of the Pardon Attorney by John Walker Lindh. Lindh is a 25-year-old American citizen who was captured on the battlefield in Afghanistan two months after the September 11, 2001 attacks on the United States. His capture, treatment and prosecution as a criminal have been subjects of intense public scrutiny and ongoing concern.

**BACKGROUND OF AP'S FOIA REQUEST**

4. John Walker Lindh was captured along with several Taliban forces in the early days of the U.S. attack on Afghanistan following the September 11 terrorist attacks within the United States. Unlike others who were taken to Guantanamo Bay, Cuba and held as "enemy combatants," Lindh was brought to a jail in Virginia and charged as a criminal. He originally was indicted on eleven counts of offenses against the United States, including conspiracy to murder U.S. nationals, providing material support and resources to foreign terrorist organizations, and using explosives in the commission of a felony. Lindh faced the possibility of a life sentence if convicted. (Attached as Exhibit A are true copies of various news reports discussing the capture of Lindh and the criminal charges filed against him.)

5. The government reportedly obtained a confession from Lindh that provided evidence of his commission of various crimes, but his defense counsel consistently proclaimed his innocence and contended that the confession had been improperly coerced. During his prosecution, reports surfaced that Lindh had been physically abused while in United States custody in Afghanistan. Specifically, Mr. Lindh was reportedly strapped naked to a stretcher by United States military personnel, blindfolded, and placed in a metal shipping container for two days upon his removal from Qala-i-Jangi prison in Afghanistan. *See, e.g.*, Barbara Starr, *U.S. Troops Took Photos of Blindfolded Walker Lindh*, CNN.COM, Apr. 12, 2002, available at http://edition.cnn.com/2002/US/04/12/ret.walker.lindh.photos/ (last viewed on June 16, 2006). (A true copy of this article showing photograph of Lindh strapped to the stretcher is attached as Exhibit B).

6. In June 2002, Lindh filed a motion in the United States District Court for the Eastern District of Virginia to suppress his confession. The government filed its opposition to

2

this motion on July 1, 2002. The following week, on July 10, 2002, six international human rights organizations, the Allard K. Lowenstein International Human Rights Clinic, Center for Constitutional Rights, Center for Justice & Accountability, Extradition and Human Rights Committee of the American Branch of the International Law Association, Human Rights Advocates, and World Organization Against Torture USA, collectively submitted a friend of the court brief, supporting Lindh's contention that he had been mistreated and the confession was inadmissible. (Attached as Exhibit C are true copies of various news reports describing the controversy over Lindh's treatment and confession and the pertinent pages of the docket sheet from Lindh's criminal case.)

7. It is my understanding that, on the day that the district court was to hear the motion to suppress Lindh's confession, Lindh instead accepted a plea bargain that required him to plead guilty to two counts of aiding the Taliban Army and carrying weapons while doing so, for which he is now serving a twenty-year prison sentence. In addition, as a part of the plea bargain, I understand that Lindh was required to drop any claim that he had been mistreated or tortured by U.S. military personnel, and to consent to Special Administrative Measures, including a gag order that prevents him from making any public statements on the matter, directly or indirectly, throughout the duration of his twenty-year sentence. (Attached as Exhibit D are articles discussing the terms of Lindh's plea agreement and the circumstances surrounding it.)

8. Two years later, in September 2004, Lindh submitted to defendants a petition for commutation of his sentence, and supplemented this petition in December 2005 (together, the "clemency petition"). It is this clemency petition that is the subject of this lawsuit. On information and belief, Lindh's clemency petition urges President Bush to reduce his sentence

3

on the grounds that he was unfairly and discriminatorily prosecuted, and is being subject to disparate treatment that is entirely unwarranted on the facts of his case.

**PUBLIC INTEREST IN LINDH'S CLEMENCY PETITION**

9. There was intense national public interest in Lindh's case in the days and months after his capture. Videotape images of him shortly after his capture were broadcast from all of the major television news outlets. Many people, including United States Senators and others, called for him to be harshly punished. *See, e.g.*, Henry Weinstein, *Response to Terror*, L.A. TIMES, Dec. 21, 2001, at A1; Gail Gibson, *Treading a Treacherous Path*, BALT. SUN, Jan. 7, 2002, at 2A. (Copies of these articles are attached as Exhibit E.)

10. The public has a keen and legitimate interest in the content of Lindh's clemency petition. The form petition for commutation provided by the OPA requires the petitioner to explain why he believes the President should reduce his sentence. (A copy of the form Petition for Commutation of Sentence, which is available at www.usdoj.gov/pardon, is attached as Exhibit F.) In Lindh's case, this explanation likely includes previously unreported facts concerning Lindh's activities in Afghanistan, his motives and reasons for being in Afghanistan at that time, and the events surrounding his capture by U.S. forces.

11. The information required to be provided in a petition for commutation differs significantly from that required to be provided in a petition for pardon. (A copy of the form Petition for Pardon After Completion of Sentence, which is available at www.usdoj.gov/pardon, is attached as Exhibit G.) In addition, according to the OPA, the President employs different standards in reviewing each kind of petition. "In general, a pardon is granted on the basis of the petitioner's demonstrated good conduct for a substantial period of time after conviction and service of sentence," according to the agency.

"Appropriate grounds for considering commutation," however, "have traditionally included disparity or undue severity of sentence, critical illness or old age, and meritorious service rendered to the government." *Standards for Consideration of Clemency Petitions*, Office of the Pardon Attorney, *available at* http://www.usdoj.gov/pardon/petitions.htm. (A copy of these standards is attached as Exhibit H.) The public has a particularly strong interest in learning whether currently incarcerated citizens were subject to a "disparity or undue severity of sentence."

12. Since filing the petition for commutation, Lindh's attorney has publicly drawn a comparison between Lindh's treatment and that of many others captured in the war on terror. He has noted that Yaser Hamdi, another American citizen who was also captured on the battlefield in Afghanistan at the same time and same place as Lindh, "was freed by the Government after detaining him for less than three years." He has also drawn a comparison between Lindh's sentence and that of others sentenced pursuant to guilty pleas since Lindh filed his clemency petition. *See* Statement of James Brosnahan, attorney for John Lindh, Regarding Petition for Commutation, dated Dec. 20, 2005 ("Brosnahan Statement"), available at http://www.freejohnwalker.net/brossnahan.html. (A copy of Mr. Brosnahan's statement and a related article are attached as Exhibit I.) Lindh's treatment has also been compared with hundreds of Guantanamo Bay detainees, many of whom were captured on the battlefield in Afghanistan, who have been released or transferred by the U.S. government without charge. *See id.* & Ex. C. Lindh's petition likely explains how his status compares with others who have received far different treatment, and thus will reveal important information about how the Department of Justice has executed its prosecutorial function, and whether it is treating similarly situated individuals in a similar manner.

5

13.     In addition, the clemency petition is likely to shed new light on Lindh's treatment by the U.S. government after his capture. In light of the revelations about Abu Ghraib and the recent deaths of detainees at Guantanamo Bay, the treatment of those held by the U.S. military remains an issue of intense interest both within the United States and abroad.

14.     According to published reports, on January 19, 2006, Lindh's father, Frank Lindh, spoke publicly about his son's prosecution and imprisonment after years of relative silence. In a lengthy address delivered to The Commonwealth Club of California, Mr. Lindh called upon President Bush to grant his son's clemency, giving a detailed account of his travels to the Middle East, the historical context leading to his capture in Afghanistan, and his handling by his interrogators. According to accounts of the address, Mr. Lindh stated that his son was "a decent an honorable young man embarked on a spiritual quest" who "never fought against America." He stated that his son was involved in the Afghan civil war, not a fight against the United States, when he joined the Taliban Army to fight the Northern Alliance. He stated that "what happened unfortunately for John is that the United States made an abrupt change after the 9-11 attacks, . . . switch[ing] sides" from its earlier support of the Taliban to supporting the Northern Alliance, and that "John was on the ground there when that happened. He certainly didn't go to Afghanistan to do anything against America." He stated that his son thought he had been rescued by American forces until they began to torture him. *See* Frank Lindh, *The Real Story of John Walker Lindh*, Jan. 24, 2006, http://alternet.org/module/printversion/31211. Many others have stated publicly that Lindh was unjustly scapegoated in the wake of the 9-11 attacks. (A copy of the Lindh article is attached as Exhibit J, together with articles containing arguments that Lindh was a scapegoat.)

15.     Criticism of Lindh's case continues today. The July issue of *Esquire* magazine, which just reached newsstands, contains a lengthy article that is perhaps the most comprehensive account of Lindh's case, and one of the most critical of the government. (A copy of this article is attached as Exhibit K.)

16.     Lindh's clemency petition is likely to present additional facts on these topics as well. The public has a significant interest in learning his version of events, because they will inform the public not only about how the prosecutorial power was exercised in this case, but how military personnel treat those captured on the battlefield.

17.     Further still, the information contained in Lindh's clemency petition will inform the public about how the Office of the Pardon Attorney, and ultimately the President of the United States, is handling Lindh's petition for commutation of his sentence. The public cannot undertake any meaningful evaluation of the propriety of the President's ultimate decision regarding Lindh's petition without access to the facts presented and the arguments made in favor of a reduced sentence. Given the extraordinary circumstances surrounding the prosecution and treatment of this particular federal prisoner, and the significant allegations that his counsel, family, and many others have made concerning the justice of his detention, the public interest in independently evaluating Lindh's clemency petition is extraordinarily high.

18.     In this case, public access to the clemency petition is uniquely needed in order to permit public oversight of the clemency process. Unlike most prisoners who petition for clemency, because of the gag order imposed as part of the plea agreement, Lindh is unable to release his petition to the public, or to make any comment at all on his situation, either directly or through counsel. The OPA's refusal to provide Lindh's clemency petition in

response to AP's FOIA request effectively makes the entire process a secret one. It makes any meaningful oversight by the public impossible.

### AP'S EFFORTS TO OBTAIN MR. LINDH'S CLEMENCY PETITION

19.     On learning that a clemency petition had been filed for Lindh, on December 20, 2005, I spoke with attorney James Brosnahan, Lindh's counsel in the criminal proceeding, to request a copy of the petition. Mr. Brosnahan indicated at that time that he was willing to release the petition to AP, but was unable to do so under the Special Administrative Measures ("SAMs") imposed as part of Lindh's plea agreement. Mr. Brosnahan expressed concern that simply providing AP with a copy of what had been filed with the OPA might be construed as an improper attempt by Lindh to communicate to the media through his attorney.

20.     At my request, Mr. Brosnahan provided me with a copy of the SAMs, which expressly prohibit Lindh from:

> talk[ing] with, meet[ing] with, correspond[ing] with, or otherwise communicat[ing] with any member, or representative of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

A true copy of the SAMs provided to me by Mr. Brosnahan is attached as Exhibit L.

21.     Given that Lindh and his counsel understood that the SAMs barred them from providing AP with a copy of the clemency petition (despite what appeared to be Lindh's willingness to release it), I submitted a FOIA request to OPA. By letter dated January 4, 2006, I requested:

> copies of petitions sent by John Phillip Walker Lindh, also known as Suleyman al-Faris, to the Justice Department's Office of the Pardon Attorney seeking a reduction in Mr. Lindh's 20-year prison sentence on charges he supplied services to the Taliban. We understand that at least one such petition was received by your office as recently as December 2005.

8

In that request I also described my conversation with Mr. Brosnahan, indicating that Lindh did not oppose release of this information. A true copy of my January 4, 2006 request is attached as Exhibit M.

22.  By letter dated January 13, 2006, OPA denied my request on the sole ground that I did not provide a privacy waiver from Lindh with my request. A true copy of the OPA denial is attached as Exhibit N.

23.  On January 19, 2006, I submitted an appeal to the Justice Department's Office of Information and Privacy, explaining that Lindh, "known internationally as the so-called 'American Taliban,'" is a "high-profile public figure" whose "privacy interest in his petition is low to nonexistent." I also explained again my understanding that the person whose privacy interest the OPA was purportedly attempting to protect did not object to providing the information to AP, but could not even give me a written privacy waiver because this would itself violate the SAMs imposed by the U.S. Bureau of Prisons. A true copy of my appeal is attached as Exhibit O.

24.  This appeal, too, was denied, by letter dated January 27, 2006. DOJ continued to take the position that the petition would only be released with a privacy waiver, and denied the appeal solely because AP had no written privacy waiver. A true copy of the DOJ denial of my appeal is attached as Exhibit P.

25.  After this litigation was commenced, I understand that Lindh's counsel, James Brosnahan, informed Mr. Morrison, the Assistant U.S. Attorney representing defendants, that Lindh was unwilling to provide a blanket privacy waiver. Upon learning this information, I contacted Mr. Brosnahan on May 30, 2006 to ask whether he would be willing to provide a redacted version of Lindh's petition, and Mr. Brosnahan indicated that he would

9

consider it. Mr. Brosnahan did not indicate the nature of any reluctance to release the entire petition, such as whether he wished to remove data like Lindh's social security number or some other category of information. He provided me with no information about the contents of the clemency petition or the type of information that his client would prefer not to have made public. Counsel for AP informed me later that day that he had followed up with Mr. Brosnahan directly, and that Mr. Brosnahan indicated that he would be prepared to provide a redacted copy of the clemency petition, so long as the Department of Justice permitted him to do so pursuant to a waiver of the SAMs.

## THE CONTENTS OF CLEMENCY PETITIONS ARE MATTERS OF LEGITIMATE PUBLIC CONCERN

26. There are good reasons why individuals who submit clemency petitions should not have a "veto" right over whether they are made public. The United States Constitution vests the President with the exclusive power "to grant reprieves and pardons for offences against the United States." U.S. CONST. art. II, § 2, cl. 1. The public has a right to know – and, indeed, a duty to determine – whether the chief executive is carrying out this extraordinary power over individual citizens' lives fairly, adequately and in accordance with justice, an inquiry that can only be made by knowing the grounds for the clemency petitions submitted to him. For this reason, the press often reports on the contents of petitions for commutation and other types of clemency petitions, particularly where the prisoner's case is high profile or he is claiming government misconduct as the basis for his petition. *See, e.g.*, Deborah Tedford, *Ex-Officials Ask Clinton For Freedom; Reyes, Maldonado Want Out of Prison*, HOUSTON CHRON., Jan. 11, 2001, at A1 (quoting petition for commutation alleging that petitioners "are serving prison sentences as a result of an unjust and unfair FBI sting operation that targeted Hispanic and African-American members of the Houston City

Council"); Michelle Mittelstadt, *Garza Requests Reprieve From Bush; Death Penalty Doubts Cited by His Lawyers*, DALLAS MORNING NEWS, May 21, 2001, at 19A (quoting from petition for commutation of death sentence alleging that "grave doubt exists as to whether or not [the petitioner's] ethnicity and state of prosecution played a role in the government's decision to seek the death penalty in his case"); *Presidential Pardon Sought for Johnson*, MILWAUKEE J. SENTINEL, July 14, 2004, at 2C (describing petition for pardon as contending the prosecution of the petitioner in 1913 "was aimed solely at punishing a successful and widely popular black athlete who openly dated white women"); Peter Slevin, *Pardon Case Like Rich's Failed; Petition Done 'Right Way' Met Wrong Result, Lawyer Says*, WASH. POST, Mar. 11, 2001, at A4 (discussing petition for clemency focusing on the "unusual length" of petitioner's sentence for white collar offense). (Copies of these articles are attached as Exhibit Q.)

27.     Indeed, in most cases where an application for clemency is newsworthy, the petition can be obtained by journalists directly from the person seeking clemency. The only reason that a FOIA request was required in this case is due to the SAMs imposed on Lindh by the government. Whatever basis may exist for the government to compel a prisoner not to speak to the press, this cannot trump the public's right to know how government is acting. The existence of the SAMs in this case should not bar the public from viewing the clemency petition so it can exercise necessary oversight on the operation of the justice system and the clemency process.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed:   Washington, D.C.
            June 16, 2006

*/s/ Ted Bridis*

                   Ted Bridis